UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| DERONE ALLEN HUFFMAN-KING, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:07-cv-19 |
| | ) | |
| v. | ) | Honorable Janet T. Neff |
| | ) | |
| KENNETH T. McKEE, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus proceeding brought by a state prisoner under 28 U.S.C. § 2254. Petitioner is serving a nonparolable life sentence for first-degree murder, MICH. COMP. LAWS § 750.316, as well as now-expired sentences for carrying a concealed weapon, MICH. COMP. LAWS § 750.227, and possession of a firearm during commission of a felony, MICH. COMP. LAWS § 750.227b. The Kalamazoo County Circuit Court imposed these sentences on April 16, 2001, after a jury found Petitioner guilty of killing Mitchell Elmer in May of 1999. The Michigan Court of Appeals and Supreme Court denied Petitioner's delayed applications for leave to appeal on direct review, and the Michigan trial and appellate courts denied his requests for post-conviction relief.

On January 8, 2007, Petitioner filed a *pro se* habeas corpus petition, with supporting documents. His petition raises the same three grounds asserted by appointed counsel in the application for leave to take a delayed appeal:

    I.      Due-process violation arising from the trial court's decision to restrain petitioner with a waist chain and a handcuff on his left hand on the third day of trial;

II.      Insufficiency of the evidence to support the jury's verdict on the charge of first-degree murder; and

III.    Prosecutorial misconduct during final argument, by vouching for state witnesses and asserting that petitioner was a gang member.

Respondent has filed an answer to the petition, asserting that Petitioner has failed to show an abridgement of his clearly established constitutional rights as required by 28 U.S.C. § 2254(b).

Judge Janet T. Neff has referred this matter to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Section 2254 Cases in the District Courts. Upon review of the state-court record and the submissions of the parties, I conclude that Petitioner's claims do not have merit and recommend that the petition be denied.

## **Procedural History**

The state-court prosecution arose from the killing of Mitchell Elmer in the City of Kalamazoo on May 30, 1999. The principal witness against Petitioner was his co-defendant, Anthony Williams. Williams informed police that on the night of May 30, 1999, at around midnight, he and Petitioner were walking in downtown Kalamazoo when they saw Elmer staggering down the street and apparently drunk. Elmer was walking home from a party store with a bag in his hand. Petitioner told Williams that Elmer, an older white man in his 40's or 50's, owed him money. The two began to follow Elmer for a period of ten to fifteen minutes, as Williams insistently asked for a cigarette. They eventually approached Elmer, with Petitioner asking for Elmer's money and Williams asking for a cigarette. Elmer denied owing Petitioner money and continued to walk. He and Petitioner had an argument. Petitioner ultimately grabbed Elmer, turned him around, and asked for his money. When Elmer denied owing Petitioner anything, Petitioner pulled a firearm out of his

pocket and fired two shots, striking Elmer twice in the back. The men then ran off. Elmer sustained two gunshot wounds, one of which was fatal. When the investigation led police to Williams, he initially denied any involvement, but ultimately, agreed to cooperate in exchange for a reduced charge.

The Kalamazoo County prosecutor charged Petitioner with open murder, as well as possession of a firearm during commission of a felony and carrying a concealed weapon. He appeared before the 8th District Court for a preliminary examination on these charges on December 12, 2000. (*See* Preliminary Examination Transcript (PE), docket # 22.) The People called Anthony Williams, who testified consistently with the facts summarized above, pursuant to a tentative plea agreement with the prosecutor under which Williams would be allowed to plead guilty to a lesser charge. (PE, 1-42.) The People also called Adrian Travier, a former cellmate of Petitioner in the Kalamazoo County Jail. (PE, 49-50.) Travier testified that Petitioner had told him that his crime was "robbery turned to murder." (PE, 51.) He told Travier that he had seen "a white guy with a lot of money" who was looking for drugs and during the process, they thought about robbing him and that Petitioner shot the guy in the chest. (PE, 51.) The People also called Roseanne Dolph, who lived in the vicinity of the killing, who testified that she observed two black men following a white man. They stopped near the intersection, and the witness saw a flash and heard two or three pops. (PE, 70-71.) She saw a gun in the hand of the lighter-complected black male. (PE, 72.) On cross-examination, she testified that she was not able to identify anyone that she saw that evening. (PE, 82.) Another neighbor, Charles Lewis, also saw the three men through his window that evening. One of the black men was hollering at the white man, demanding cigarettes. (PE, 94-95.) Lewis identified Petitioner as one of the men that he saw that night. (PE, 95.) Lewis confirmed that the

white man looked "a little drunk." (PE, 98.) In addition to demanding cigarettes, one of the men asked the victim "what's in that bag?" (PE, 99.) Lewis left his house to get a better view. (PE, 101-02.) He then heard two or three shots, but he did not see which of the men had a gun. (PE, 103-04.)

After presentation of testimony, the assistant prosecutor moved for leave to amend the Information by adding a third count for carrying a concealed weapon. (PE, 120-21.) The court considered the testimony, as well as the autopsy report that was stipulated into evidence, finding sufficient evidence to bind Petitioner over on all three charges. (PE, 126.)

At trial, Kalamazoo Police Officer Douglas Hammerberg testified that, during the evening hours of May 30, 1999, he was dispatched to 1104 Fairbanks, where he found a white male lying on his back on the front step, with his head propped near the door. (Tr. II, 250.) The man was bleeding from what appeared to be gun shot wounds near his chest and in his back. (Tr. II, 250.) Hammerberg attempted to apply direct pressure to the wounds until the ambulance arrived. The man, who was identified as Mitchell Elmer, was transported to the hospital. (Tr., II, 251-52.) He was somewhat stabilized in the emergency room and taken to emergency surgery, where he died. (Tr. II, 252.) Hammerberg took possession of Elmer's wallet, watch and clothing. In addition, the doctors gave him a bullet that was located just under the skin of Elmer's left hip. (Tr. II, 252.) Hammerberg and Sergeant Seifferly bagged and secured all of the items and took them to the Kalamazoo Department of Public Safety, where they were stored as evidence. The victim's clothing was placed in a secured drying locker and the other evidence was delivered to the evidence room (Tr. II, 252-54.) Later that day, Petitioner was present at the autopsy for the purpose of identifying the deceased as the same person he had seen on the porch and at the hospital. (Tr. II, 253, 268.)

Kalamazoo Police Officer Jason Hendrick testified that, when he arrived at the scene, Hammerberg and Fire Engine Operator Herman were attending to the victim. (Tr. II, 271.) Other officers were present as well, including Sergeant Marcelletti, who was putting up crime scene tape. (Tr. II, 274.) Hendrick was responsible for securing the scene and locating witnesses. He determined that the victim's brother, David Bruce Elmer, was the owner of the home at which the victim was found, and he spoke with David Elmer. (Tr. II, 271.) Hendrick also spoke to a black male who refused to identify himself and who was standing at the corner of Fairbanks Avenue and Beacon Street. (Tr. II, 272.)

David Elmer (David) testified that the victim was his younger brother, Mitchell Elmer, who was 35 years old. (Tr. II, 277-78.) On the night of the incident, David had returned home and was listening to his stereo in the recreation room in the basement of his house. (Tr. II, 278.) At about midnight, he noticed the clock and thought he would go to bed. He went upstairs and got into bed, but he remembered that he had forgotten to take his medication. He then got up and went downstairs. He looked out his picture window and heard some moaning coming from his left. David looked to his left and saw his brother's legs lying on the porch. (Tr. II, 279.) David thought Mitchell was drunk. David opened the front door, but could not open the screen because his brother's head was against it. David then ran out the side door and around the house to see what was the matter with Mitchell. David saw blood on Mitchell's shirt and heard Mitchell repeat, "Dave, I got shot." (Tr. II, 279.) He told his brother to hold on and ran into the house to dial 911, where he reported that his brother had been shot. (Tr. II, 279.) When the police arrived and pulled up his brother's shirt, David saw a bullet hole in Mitchell's chest. He never saw his brother again. (Tr. II, 280.) David had seen his brother earlier that day, at about 2:00 p.m. (Tr. II, 281.)

Kalamazoo Police Officer Tracy Lee Cochran testified that he worked as a lab technician in May 1989. (Tr. II, 283.) He identified Mitchell Elmer's clothing from the evidence tag, and he reported that he found 13 cents in the evidence bag, as well as 14 dollars and a penny in the left front pocket of the pants. (Tr. II, 285.) He noted two bullet holes in the white t-shirt. (Tr. II, 286.)

Kalamazoo Police Officer Gerald Leudecking testified that he was a laboratory technician who processed crime scenes for evidence and processed evidence in the laboratory for trace evidence such as fingerprints, hairs and fibers. (Tr. II, 289.) He was called in at approximately 2:30 a.m. on May 30, 1999 to process the scene for any physical evidence. (Tr. II, 289.) He recovered a bullet, a paper sack containing a vodka bottle and a 40-ounce bottle of beer, and a Gatorade bottle. (Tr. II, 290.) The bag was found about four feet from the door of David Elmer's house. The Gatorade bottle was found in the street in front of the house, and the bullet was found near the curb on the west side of the street, slightly south of the house. (Tr. II, 291, 294.) Leudecking identified photographs that he took at the scene. (Tr. II, 294-306.)

Tracey Seifferly testified that he was a Kalamazoo Police Officer who arrived at the scene shortly after Officer Hammerberg. He observed what appeared to be an exit wound on the victim's left chest and two entrance wounds on the lower back. (Tr. II, 320.) Seifferly supervised the scene that evening. He located a bloody bullet at the northwest corner of Fairbanks and Beacon, which he pointed out to Officer Leudecking when he arrived. (Tr. II, 320-21.) Seifferly testified that he believed the victim had been drinking as he smelled strongly of intoxicants and the bag containing the beer and vodka was near him. (Tr. II, 322.)

Officer Brett Applgren testified as the director of the crime lab for the Kalamazoo Department of Public Safety. He is qualified to perform forensic examinations of evidence, fingerprint comparisons, photography, evidence collection and preservation, video enhancement from computers and drug analysis. (Tr. II, 330.) He observed a bullet entry hole in the rear of the jeans and in the t-shirt. (Tr. II, 331.) Applgren testified that the bullet was sent to the Michigan State Police for ballistics comparison to determine, if possible, the caliber of the bullet and the type of weapon from which it was fired. (Tr. II, 332.) Applgren raised one latent palm print from the bag, which did not match that of the victim. (Tr. II, 333.) He found no fingerprints on either of the two bottles in the bag. (Tr. II, 335.) He also found no prints on the Gatorade bottle. (Tr. II, 337.) Applgren testified that he attended the autopsy and viewed two bullet entry holes in the victim's back, one of which also produced an exit wound on the chest. (Tr. II, 337.) Applgren identified photographs he took during the autopsy. (Tr. II, 337-340.)

Forensic pathologist Waldemar Palutke testified that he conducted the autopsy of Mitchell Elmer on May 30, 1999. (Tr. II, 360.) He found two gunshot entrance wounds, both of which were located on the back, one in the mid-portion of the back just left of the midline, and one on the lower part of the left side of the back. (Tr. III, 360.) Although the upper wound resulted in much more serious internal injury, both caused significant bleeding. The upper wound perforated the entire left lower lobe of the lung and exited the upper lateral part of the front of the chest. The lower wound perforated the soft tissues of the buttock and left hip and did not enter any vital cavity or involve any vital structure. (Tr. II, 361.) The lower shot alone was unlikely to have proved fatal. (Tr. II, 365.) Palutke found the manner of death was homicide caused by the gunshot wounds. (Tr. II, 361, 368.)

Michigan State Police First Lieutenant Stuart Burritt testified as an expert in firearm identification. (Tr. II, 378.) He received two fired lead bullets for analysis. (Tr. II, 379.) He concluded that the bullets most closely compared to a .32-caliber Smith and Wesson. (Tr. II, 380, 82.) Because some people make their own bullets, about which Burritt would have no information, he could only say the bullets most likely were .32-caliber Smith and Wesson lead bullets. (Tr. II, 382.) Burritt also testified that the bullets were fired from the same gun. (Tr. II, 380-81, 386.) In addition, the bullets most likely were fired from a Herrington and Richardson, Iver Johnson or Smith and Wesson handgun. (Tr. II, 380, 383-84.)

Michigan State Police Sergeant Thomas Tanczos testified that he had been on the Michigan State Police Underwater Recovery Team for fifteen years. He was contacted by the Kalamazoo Police Department to assist in finding a gun in the Kalamazoo River on November 22, 2000. (Tr. II, 390.) He served as dive master in charge of a team of six. They had good visibility in the water. Using a cable cross search pattern, they found no guns in the river. (Tr. II, 391.)

Kalamazoo County Police Officer Kenneth Alofs testified that he was a detective on May 30, 1999, and was assigned to investigate the case. He initially was called to the scene at 2:30 a.m. on May 30, 1999. He spoke briefly to Sergeant Marcelletti. (Tr. III, 409.) Sometime later that morning, Alofs spoke with Charles Lewis, an elderly black man who lived at 1022 Charlotte, who led Alofs to make inquiries at 715 Charlotte. (Tr. III, 410, 426.) At the 715 Charlotte Street address, Alofs found family members of Anthony "Mark" Williams, the cooperating codefendant who testified against Petitioner at trial. (Tr. III, 410.) Alofs spoke with Mark Williams at about 10:00 a.m. at the same address. (Tr. III, 411.) In the evening of May 30, 1999, Alofs spoke to both Williams and Petitioner outside the house. Alofs asked if Petitioner had been at the residence the

evening before, and Petitioner told Alofs that he had been at 715 Charlotte visiting his girlfriend, Teonna Williams, Mark Williams' sister, at the time of the murder. (Tr. III, 411.) Petitioner denied any knowledge of the shooting. (Tr. III, 412.) About two weeks later, on June 15, 1999, as Alofs was driving his car, he saw Petitioner walking. Alofs stopped and talked to Petitioner again, telling Petitioner that he would like him to come to Alofs' office to answer a few more questions. Petitioner was hostile, saying that he already had cooperated and that Alofs was harassing him. (Tr. II, 412-13.) Alofs next saw Petitioner on September 11, 2000, when Petitioner was in jail on an unrelated charge. Alofs told Petitioner that he had learned that Petitioner had talked with at least a couple of different people and had made admissions about his involvement. Alofs then asked if Petitioner was now willing to talk with him. Petitioner agreed to speak with Alofs the next day, after he had been released from custody. (Tr. III, 415.) Alofs arranged for Detective Sharon Whaley to interview Petitioner. (Tr. III, 415.) After Whaley had spent time interviewing Petitioner, she gave Alofs a purported statement from Petitioner. Alofs then took the statement and went into the interview room to talk to Petitioner about the statement. (Tr. III, 416-17.) Alofs asked Petitioner if he knew what had happened to the murder weapon. Petitioner said that he did not know, but he believed that Mark Williams may have gotten rid of it or sold it. (Tr. III, 420.)

Alofs testified that, after Petitioner was arrested, he interviewed Lewis McCoy and Adrian Travier at the Kalamazoo County Jail. (Tr. III, 421.) Neither McCoy nor Travier asked for or received anything in exchange for their information. (Tr. III, 423-24.) Alofs also interviewed Patricia Strickland and Rose Dolph, who lived at 1414 Beacon, very near Charles Lewis' house and located about one-tenth of a mile from the crime scene. (Tr. III, 426.) During his contacts with Petitioner in 1999, Petitioner had thin sideburns extending to a small beard and a mustache, which

he no longer had at the time of trial.  (Tr. III, 427.)  According to Alofs, Williams was shorter than Petitioner by at least a couple of inches, darker skinned, and had no facial hair.  (Tr. III, 428, 430.)  When he interviewed Ms. Dolph, she told him that the person who actually shot Mr. Elmer was the man with the thin sideburns and beard.  (Tr. III, 430.)  On cross-examination, Alofs acknowledged that Rose Dolph, Pat Strickland and Charles Lewis, having been shown Petitioner's photograph or seen him in a physical lineup, were unable to identify him as having been involved in the shooting.  (Tr. III, 434-37.)  Ms. Dolph did identify Petitioner as someone who looked familiar, but she could not say whether he was familiar because of the crime or from having been in the neighborhood.  (Tr. III, 446.)  Alofs acknowledged that Mark Williams repeatedly had denied any involvement in the shooting until September 13, 2000, after Alofs told Williams that Petitioner had made a statement.  (Tr. III, 442.)

Teonna Williams testified that she had known Petitioner for five or six years and he was the father of her eight-month-old son.  (Tr. III, 452-53.)  At the time of the shooting, Petitioner was her boyfriend.  (Tr. III, 453.)  Her brother, Mark Williams, was friends with Petitioner, and Petitioner frequently stayed at her home at 715 Charlotte. (Tr. III, 453.)  On the evening of May 30, 1999, she went to the store with her sister and her brother's girlfriend.  (Tr. III, 455.)  She was with Petitioner after she came home from the store, but she did not recall whether they were together all night or whether he went out for awhile.  (Tr. III, 455.)  The next morning, she learned of the shooting when the police came to her house.  (Tr. III, 455-56.)  The police spoke with her brother, but she did not know if they spoke with Petitioner at that time.  (Tr. III, 456.)  A couple of days after the shooting, Petitioner talked to her about the shooting, indicating that he had seen a man being murdered.  (Tr. III, 456, 482.)  Petitioner said that he was hiding behind some bushes with Mark

Williams. (Tr. III, 456-57.) Petitioner then broke up with Teonna, indicating that the people he had seen were going to come after him. (Tr. III, 457.) A couple of weeks later, Petitioner stated that he and Mark had been coming from somewhere when a white man approached, asking them for some dope or drugs. They denied having anything, but the man was pushing or rubbing against them asking for drugs. According to Petitioner, they thought the man had a gun and, while they were tussling with him, the man got shot. (Tr. III, 458, 482-83.) Petitioner admitted at that time that he had shot the white man. (Tr. III, 459-60, 463-64.) He later told Teonna that Mark had shot the man and Petitioner wasn't going to take the punishment for it. (Tr. III, 467, 473, 490, 492.) Teonna testified that, after the shooting, Petitioner began to smoke marijuana and drink frequently. He also became mean, when he had been very sweet before the shooting. (Tr. III, 474.) He also repeatedly said that he wanted to kill himself. (Tr. III, 475.)

On cross-examination, Teonna testified that she had seen her brother, Mark Williams, with a handgun. (Tr. III, 489.) She also testified that, sometime after May 30, 1999, she was present when her brother threatened Petitioner with a handgun. (Tr. III, 489.) The threat had nothing to do with the incident at issue in the trial. (Tr. III, 497.)

Anthony "Mark" Williams testified that he was providing testimony under a plea agreement made on December 8, 2000, in exchange for the right to plead guilty to being an accessory after the fact to a felony and dismissal of the murder charge. (Tr. III, 502.) Williams testified that he was an accessory after the fact because he disposed of the weapon. (Tr. III, 503.) According to Williams, he and Petitioner were coming from the East Main Food and Beverage. (Tr. III, 505.) As they walked back toward home and reached the intersection of Dwight and Hotop Streets, they saw a man coming from the opposite direction. Petitioner asked the man for the money the man owed

him, and then Williams also began to demand the money. (Tr. III, 506.) The man kept walking, saying that he did not owe any money and did not know who they were. (Tr. III, 507.) They told the man that if he gave them the money, there would be no problems. (Tr. III, 507.) Williams and Petitioner began to follow the man down Dwight Street, repeatedly telling him to give them the money. They turned left at Center Street, heading toward Charlotte, continuing to argue. Williams also repeatedly asked for a cigarette and demanded that the man give them what he had in his bag. (Tr. III, 507-08.) The man refused and kept walking. (Tr. III, 508.) They continued to follow the man from Charlotte to Beacon and from Beacon to the corner of Fairbanks. (Tr. III, 508.) At that point, the argument got louder and the man kept refusing to give them money and denying that he owed money. According to Williams, they had reached the point when they were going to take the money. (Tr. III, 509.) The man walked off, and Petitioner pulled a .32-caliber pistol and fired two shots at him. After the shots were fired, Petitioner ran one way and Williams ran another way. (Tr. III, 509.) Williams knew the caliber of the gun because he had seen it earlier that day, when Petitioner showed it to him at Williams' house. (Tr. III, 509-10.) When he shot the victim, Petitioner was standing five to seven feet away. (Tr. III, 510.) Williams was standing 20 to 25 feet away, behind and to the right of Petitioner. (Tr. III, 511-12.)

Williams and Petitioner met up about 20 or 30 minutes later at Williams' house. (Tr. III, 511.) Williams and Petitioner talked and agreed that, if asked, they would deny any involvement. (Tr. III, 511.) According to Williams, he had been drinking that night, and probably had consumed a half-pint of whiskey. Petitioner had been smoking marijuana, but Williams did not know whether he had been drinking. (Tr. III, 512.) Williams testified that, while he had been prepared to rob the man and beat him up, he did not think any weapons would be involved. Because he believed he

would be held responsible despite the fact that he did not fire the gun, Williams agreed to get rid of the gun. (Tr. III, 513-14.) He wrapped the gun in an old towel, put it in a bag with a few rocks, and threw it into the river from the bridge at Paterson and Riverview. (Tr. III, 514.) The gun was a .32-caliber revolver, not an automatic. (Tr. III, 515.) Williams previously had owned a .32-caliber handgun, but the police had taken it and his brother had been arrested for having it some time before May 30, 1999. (Tr. III, 515.)

When Alofs interviewed Williams on May 30 and on a number of occasions after that, Williams repeatedly denied involvement, believing that he was equally liable as Petitioner for the death. (Tr. III, 515.) When he was called to testify on an investigation subpoena, Williams repeatedly invoked the Fifth Amendment, though he continued to lie outright about his involvement in the disposal of the weapon. (Tr. III, 516.) Williams also acknowledged lying at Petitioner's preliminary examination about whether he had lied on the investigative subpoena. (Tr. III, 517.) Williams denied shooting Elmer. (Tr. III, 517.) He testified that he was 5' 9" tall and that Petitioner was approximately 6' 1" tall. (Tr. III, 517-18.) Williams also testified that he was two or three shades darker than Petitioner and had never had a beard or sideburns going down to his chin. (Tr. III, 518.)

On cross-examination, Williams acknowledged that he typically carried a handgun on the street and had carried both a .32-caliber handgun and other types, including semi-automatic weapons. (Tr. III, 521.) He also stated that, although the argument with Elmer was about Elmer's owing Petitioner money, Petitioner owed Williams money from crack cocaine transactions. (Tr. III, 522.) As they followed Elmer, Williams was carrying a paper bag containing a 22-ounce beer, and Petitioner was not carrying any bag. (Tr. III, 523.) Williams also acknowledged that he previously

-13-

had lied to Alofs and the police repeatedly, identifying at different times Shamar Mitchell and Anthony Moore as the shooters and stating that Moore had admitted to Williams that Moore was the shooter. (Tr. III, 528-29.) Williams also admitted that he bought a handgun from Anthony Moore. (Tr. III, 533.) In addition, after the murder, Williams threatened Petitioner with a gun. (Tr. III, 534.) Williams' story only changed after he was offered a plea deal that reduced his murder charge to an accessory charge bearing a maximum of five years. (Tr. III, 535.) Williams acknowledged lying under oath after promising under his plea agreement to tell the truth. (Tr. III, 535.) He also acknowledged that he had not previously told the prosecutor that he had put .32-caliber bullets, as well as 9 mm bullets, in the bag before he dropped the gun in the river. (Tr. III, 538.)

Charles Lewis testified that, on May 30, 1999, he lived at 1022 Charlotte St., at the corner of Beacon Street. (Tr. III, 566-67.) Sometime after midnight on the night of the shooting, his attention was drawn by loud talking outside his house. He went to his door and saw a white man between 30 and 40 years, followed by a shorter, medium complected black man and then by Petitioner, whom Lewis identified in court. (Tr. III, 568.) According to Lewis, the shorter black man was jumping up and down screaming at the white man that he wanted a cigarette. (Tr. III, 569.) The shorter black man was about eight feet behind the white man, and Petitioner was about four feet behind the shorter black man. (Tr. III, 569-70.) The white man was carrying a bag in his right hand. Lewis did not see anything in the hands of the other two at that time. (Tr. III, 570.) The men went to the corner of Beacon Street and turned, and Lewis moved from his living room to his kitchen window. The shorter black man asked the white man where he was going, and the white man said he was going to his brother's house. Lewis stated that he knew everyone on the street, but he had never seen the white man before. (Tr. III, 570.) The shorter black man asked if his brother would

have a cigarette, and the white man said yes. (Tr. III, 571.) At that point, Petitioner came around the side of the house with his hand out, holding a gun inside a bag. Lewis could not see the gun, but recognized its outline in the bag, something he had seen a number of times before. (Tr. III, 571.) Petitioner was holding the gun straight out with his left hand. (Tr. III, 571.) When he saw the gun, Lewis decided he needed to go outside. He turned off his motion-sensing light, though his other garage light and his neighbor's light both remained on, illuminating the street. (Tr. III, 572.) Lewis testified that he never heard Petitioner's voice, though he continued to hear the other black man's voice as they kept walking down Beacon and crossed the street. When they reached the corner of Fairbanks Street, the three stood for 30 or 35 seconds before the shots were fired. Lewis heard two or three shots but could not actually see the shots, as the men had their backs to him. (Tr. III, 573, 576.) When he heard the shots, Lewis was standing on the side of the street, next to his driveway. (Tr. III, 574.) He estimated that he was about 900 feet away from the men at the time of the shots. (Tr. III, 582.) Lewis saw the black men run and the white man appeared to continue walking. (Tr. III, 574.) When the police came, Lewis talked to them, but he did not want to give his name. Lewis said that, if a person was capable of shooting a man when all he wanted was a cigarette, he was afraid for the safety of his wife and grandchildren if he talked to police. (Tr. III, 575.) However, when Alofs came to his house later that morning, Lewis gave Alofs his name. (Tr. III, 575.)

Rose Dolph testified that she lived at 1414 Beacon Street on May 30, 1999. Sometime after midnight, Dolph was sitting at the kitchen table talking to her daughter, mother, and sister-in-law. (Tr. III, 589.) She saw three males walking down the street: a white man, a light-skinned black man and a darker black man. The white man stepped up to the curb and the other two men were standing right by him. She heard a pop and looked out the window. She heard two more

pops and saw two flashes.  (Tr. III, 589-90.)  She thought it was a cap gun at first because it did not

sound like a real gun.  (Tr. III, 589.)  The white man continued walking east, one black male walked

up the hill and the other walked the opposite way.  According to Dolph, the flashes came from the

taller, light-skinned black male.  (Tr. III, 589.)  The light-skinned male had long, thin sideburns

extending down to a goatee. (Tr. III, 598.)  Both black men were standing close to one another and

facing the white male.  (Tr. III, 590.)  Dolph stated that she could see the men clearly because they

were directly under a street light.  (Tr. III, 592.)  After the shots were fired, the white man walked

in the direction of David Elmer's house, which was kitty-corner from Dolph's house, though she did

not know David Elmer.  (Tr. III, 591.)  On cross-examination, Dolph acknowledged that, if the black

men and white man were facing one another, the shots would have struck the white man in the front

of the body.  (Tr. III, 597.)  Dolph was shown the photographic lineup that she previously had

viewed.  She reiterated that she could not identify any of the men as the shooter, but she identified

Petitioner's picture as someone who resembled a person from the neighborhood.  (Tr. III, 601-02.)

Patricia Strickland, Dolph's sister-in-law, testified that she was living with the Dolphs

on May 30, 1999.  (Tr. III, 603.)  Shortly after midnight on that date, she was sitting at the Dolph's

kitchen table.  (Tr. III, 604.)  She noticed three men walking down the street, talking and jostling

back and forth.  (Tr. III, 604.)  When the men reached the corner, they separated a bit, and the light-

skinned black man and dark-skinned black man stepped off the curb while the white man remained

on the curb.  (Tr. III, 604-05.)  The three men were standing eight to ten feet apart.  (Tr. III, 605,

608.) The black men and the white man were facing one another.  (Tr. III, 608.)  The next thing she

knew, the light-skinned man fired a gun three or four times.  (Tr. III, 604-05.)  The light-skinned man

was approximately three inches taller than the dark-skinned man.  (Tr. III, 605.)  After the shots were

fired, she saw the white man walk up Fairbanks, but she could not say where the other two men went.  (Tr. III, 605.)

Archie Parker testified that he had known Petitioner for some time.  (Tr. III, 612.) According to Parker, Petitioner was at Parker's house in 1999 and they were talking about killings in Chicago.  (Tr. III, 613, 615.)  Petitioner told Parker that Petitioner and Williams had been walking and decided to rob a man.  Petitioner said the man started to run and Petitioner and Williams pulled out guns and shot the man.  (Tr. III, 615.)  Four shots were fired.  (Tr. III, 619.)  Petitioner said he did not know if he hit the man or Williams did.  (Tr. III, 616.)  Before telling Parker about the shooting, Petitioner told Parker to "[p]it it on the G that you ain't going to tell anybody."  According to Parker, "G" refers to a gang member of the "GD," the Gangster Disciples.  (Tr. III, 616-17.)  The expression means that you won't tell anyone.  (Tr. III, 617.)  Petitioner told Parker that he threw the gun in the water.  (Tr. III, 617.)  Petitioner also told Parker that, after he had been shot, the white man said, "Thanks."  Petitioner asked Parker what he thought the man meant.  (Tr. III, 621-22.) Parker told Petitioner that it meant that the man would come back and haunt him.  (Tr. III, 622.) Parker was arrested the same day Petitioner told him the information.  While he was locked up, he told the police what Petitioner said.  (Tr. III, 622-23.)  Parker did not ask to speak with police and he made no deal with police in exchange for the information.  (Tr. III, 623.)

Lolita Rose, Archie Parker's girlfriend, testified that she lived with Parker in 2000 and Petitioner lived with them for about three months.  (Tr. III, 628-29.)  During that time, Parker asked Rose what it meant when you shot someone and they told you thanks.  She told Parker that it meant that the person who was shot was going to haunt you.  (Tr. III, 630.)

Adrian Travier testified that he was Petitioner's cellmate in the Kalamazoo County Jail on October 20, 2000. According to Travier, Petitioner told him that he was on Fairbanks Street and he and "Little Mark" saw a white man come up. They were trying to figure out how much money the man had and they were in the process of trying to rob the man when Petitioner shot the man in the left, upper chest area. (Tr. IV, 642-43.) Travier later learned that "Little Mark" was Anthony Williams. (Tr. IV, 643, 650.) Petitioner told Travier that, after he shot the man, the man ran to a house and called 911. The man later died. (Tr. IV, 644.) Petitioner also told Travier that he wanted to put the blame on Anthony Williams because Williams already had a record for having a pistol in a shooting. (Tr. IV, 644.) Prior to the conversation with Petitioner, Travier knew nothing at all about the case. (Tr. IV, 644-45.) After Petitioner told him the story, Travier approached Sergeant Kipp at the Kalamazoo County Jail and later gave a statement to Detective Alofs. (Tr. IV, 645.) According to Travier he gave the information because an innocent person was dead for no reason. He denied asking for or obtaining any benefit from his testimony. (Tr. IV, 645.) Travier was housed at Jackson Prison at the time of trial. (Tr. IV, 645.) Travier reported that he was scared about coming forward with the evidence because it is dangerous in prison for people to know you are a "snitch." (Tr. IV, 646.) On cross-examination, Travier acknowledged that three or four other men were in the cell with Travier and Petitioner at the time the statement was made, including Claxton Johnson. (Tr. IV, 647, 652.) Travier also told Alofs about a conversation he had with another prisoner who reported that Williams claimed to know where the murder weapon was located. (Tr. IV, 654, 656, 658-59.)

Louis McCoy testified that he was Petitioner's cellmate at the Kalamazoo County Jail on October 10, 2000. (Tr. IV, 661.) He was not in the cell at the same time as Adrian Travier, and

he did not know Travier. (Tr. IV, 662.) While he and Petitioner shared the same cell, Petitioner told his cellmates that he and another guy were charged with murder. Petitioner bragged that he committed the murder with a .32-caliber handgun. He told McCoy that the other guy was trying to put the blame all on Petitioner, so Petitioner was, in turn, going to put the blame on the other guy. (Tr. IV, 662-63.) Petitioner complained that, if the other guy hadn't been bragging about the killing, Petitioner would not have been caught. Petitioner admitted being the shooter. (Tr. IV, 663.) Petitioner also talked about staying cleanly shaved, because, at the time of the shooting, he had long, thin sideburns that extended into a goatee and he didn't want the witnesses to see him that way. (Tr. IV, 663.) While in jail, Petitioner drew a lot of pictures, including one showing himself with the same sideburns and goatee pointing a gun. (Tr. IV, 664.) McCoy testified that he did not seek or receive any benefit for making a statement. (Tr. IV, 665.) At the time McCoy gave his statement to Alofs, McCoy was half-way through his 60-day sentence and had no other charges pending. (Tr. IV, 665.) After he made his statement, McCoy became a jail trustee, where the conditions of his confinement were far better. (Tr. IV, 669-70.)

Detective Kenneth Alofs was recalled to the stand. He testified that Damion Wyatt, Mark Williams' brother, was arrested with a .32-caliber pistol on February 20, 1999, several months before the shooting at issue in the instant case. The weapon was confiscated and destroyed. (Tr. IV, 676-77.) Alofs also testified that he learned of Archie Parker as a witness when Parker was arrested on another matter and told the jail staff that he wanted to speak to someone about Petitioner's case. Alofs gave Parker no facts about the case and made no promises to Parker. (Tr. IV, 677-78.) In addition, he did nothing to facilitate McCoy becoming a jail trustee. (Tr. IV, 678.) Moreover, according to Alofs, he attempted to interview Teonna Williams, but her mother, Debra Kelley, did

-19-

not want family members to talk to Alofs. He eventually interviewed Teonna when he caught her at home when Mrs. Kelley was not there. Teonna was reluctant to speak with him. (Tr. IV, 679.) Finally, Alofs confirmed that, in his statement of July 23, 1999, Mark Williams told Alofs that Petitioner shot Elmer twice in the back after Elmer began to run. (Tr. IV, 682.)

The prosecutor then rested his case. (Tr. IV, 683.) Petitioner moved for a directed verdict, which the court took under advisement until the next recess. (Tr. IV, 684.)

The defense called Claxton Johnson to the stand. Johnson testified that, in October 2000, he was in a cell with Petitioner at the Kalamazoo Jail for about two-and-one-half months. (Tr. IV, 686, 688.) Adrian Travier was also in the cell. (Tr. IV, 686.) While in jail together, Petitioner and Johnson became close friends. (Tr. IV, 686.) Germaine Hopkins also was in the cell and became close to both Petitioner and Johnson. (Tr. IV, 688.) Petitioner rarely talked to Adrian Travier. (Tr. IV, 688.) Johnson never heard Petitioner discuss the case with any person in the cell, including Johnson himself. (Tr. IV, 688-89.) Johnson testified that no one had threatened or promised him anything for his testimony. In fact, he had been expressly told that no one could or would do anything for him. (Tr. IV, 690-91.) Johnson was not in the cell while Louis McCoy was there. (Tr. IV, 692.) Johnson testified that Petitioner drew pictures and wrote poems for Johnson's girlfriend on the outside. According to Johnson, Petitioner never drew a picture of a gun or anything violent. (Tr. IV, 693.)

Willie Germaine Hopkins testified that he was incarcerated in the Kalamazoo County Jail beginning October 19, 2000. (Tr. IV, 696.) He was housed with Claxton Johnson and Petitioner. (Tr. IV, 696.) Adrian Travier was in the cell also. (Tr. IV, 697.) Hopkins testified that he and Petitioner became close while in the cell together, and they talked all the time. (Tr. IV, 697.)

Hopkins thought of Petitioner as a little brother. (Tr. IV, 698.) While they were in the cell together, Petitioner talked to Hopkins about the offense he was charged with. (Tr. IV, 698.) Hopkins denied that Petitioner had ever made a statement admitting that he had shot someone. (Tr. IV, 698.) According to Hopkins, Petitioner did not trust Travier and never discussed his case with Travier. (Tr. IV, 698-99.) Petitioner did not trust Travier because Travier came on strong to Petitioner and tried to pry into his personal matters. (Tr. IV, 700.) The other cell occupants, including Claxton Johnson, Petitioner and "Duke" discussed Travier's lack of trustworthiness. (Tr. IV, 701-02.) Hopkins testified that Petitioner drew pictures for other inmates in exchange for food or stamps. (Tr. IV, 702.) Hopkins never saw Petitioner draw an act of violence, though, had someone asked, he would have in exchange for something. (Tr. IV, 702.) In the cell, Petitioner was closest to Hopkins and next closest to Johnson. (Tr. IV, 702.) Hopkins stated that he had not been promised anything for his testimony and that he had been informed that there was nothing anyone could or would do for him. (Tr. IV, 703.) Hopkins was not in the cell with McCoy; he came after McCoy had been made a trustee. (Tr. IV, 706.)

Outside the presence of the jury, Petitioner moved for a directed verdict on the first-degree murder charges, arguing that there had been no evidence of premeditation to support premeditated murder and no evidence of robbery to support felony murder. (Tr. IV, 710.) The court denied the motion in both respects, but concluded that the evidence for attempted robbery was close, supported only by inferences. (Tr. IV, 715.) Petitioner waived his right to testify. (Tr. IV, 718.) The defense rested. (Tr. IV, 740.)

After the prosecutor had completed his closing argument, the court was advised that a defense witness who had been hiding from the police had been located. The court reopened the

proofs to take the testimony of Anthony Moore. (Tr. IV, 781-82.) Moore testified that he used to live down the street from Mark Williams. In the summer of 2000, Moore was visiting Mark Williams at Williams' mother's house on Charlotte Street. Mark's cousin, John Gamble, also was present. (Tr. IV, 783-84.) In response to something John Gamble said, Mark Williams told Moore that he and Petitioner were walking up the hill and Mark was picking on some guy. The guy seemed to be "going for something," and Mark said he was scared and shot the man. (Tr. IV, 785.) Mark Williams said that Petitioner had also shot, but up in the air. (Tr. IV, 785.) Moore testified that he had spoken with Detective Alofs in June 1999, but he had not told him about the statement. He called Alofs a week before his testimony to inform him that Mark had said he shot the man. (Tr. IV, 785, 86.) Moore testified that he told Alofs that Petitioner shot up in the air. (Tr. IV, 786-87.) On cross-examination, Moore was challenged on the basis of his earlier lies. (Tr. IV, 787-89.) Moore claimed that Alofs, acting on information from Mark Williams, had accused Moore of being involved in the crime. (Tr. IV, 790-91.) Moore also denied selling Williams a gun in the winter months of 1998-99. (Tr. IV, 791.) Moore worried that telling the truth about the gun could put his parole in jeopardy. (Tr. IV, 791.) He also concluded that, if the police were going to blame him for the offense, Moore would tell them nothing. (Tr. IV, 790.) In June 1999, Moore was locked up on a parole hold, at which point he decided to tell the truth about the gun. (Tr. IV, 791.) The defense rested again. (Tr. IV, 793.)

On rebuttal, Kenneth Alofs was recalled to the stand. (Tr. IV, 794.) Alofs testified that, when Moore called him the week before, he stated that Petitioner had also fired his gun at the victim, but that Williams was the only one who hit the victim. Alofs denied that Moore told him that Petitioner had fired into the air. (Tr. IV, 794-95.)

Anthony Williams also was recalled to the stand. Williams denied making the statement to Moore. (Tr. IV, 798.) The prosecution again rested. (Tr. IV, 800.)

At the conclusion of trial, on March 19, 2001, the jury found Petitioner guilty of first-degree murder on both theories of premeditated murder and felony murder, possession of a firearm during the commission of a felony, and carrying a concealed weapon. (Tr. V, 880-81.) On April 16, 2001, Petitioner was sentenced to serve a two-year term for the felony-firearm conviction followed by a consecutive term of a term of two to five years for the concealed weapon offense and life imprisonment without parole for first-degree premeditated murder. The court vacated the felony-murder conviction on double jeopardy grounds. (Sentencing Transcript, (S. Tr.), 4-5, 10, docket #28.) During his opportunity for allocution at sentencing, Petitioner strenuously asserted his innocence. He also placed on the record his objection to the fact that, during trial, the court failed to respond to his written request for a hearing on his request to remove his attorney based on problems between them. (S. Tr., 6.) He also objected to having been tried while in restraints when no record had been produced to support the deputies' claim that Petitioner had threatened staff. (S. Tr., 6.) Petitioner stated that he had felt unable to raise his complaints at the time because the trial court had threatened to remove him from the courtroom if he made any outbursts. (S. Tr., 7.)

### B.    Direct Appeal

Petitioner filed a delayed application for leave to appeal to the Michigan Court of Appeals. His brief, which was filed by counsel on April 16, 2002, raised the same three issues he raises in his application for habeas review. (See Def.-Appellant's Br. on Appeal, docket #29.) By unpublished order issued on June 27, 2002, the Michigan Court of Appeals denied leave to appeal for lack of merit in the grounds presented. (See 6/27/02 Mich. Ct. App. Order (MCOA Ord.), docket

#29.)  On its own motion, however, the court of appeals ordered the case remanded for correction of the judgment of sentence.  (*Id.*)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals.  By order entered January 31, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See 1/31/03 Mich. Ord., docket #30.)

### C.      Post-conviction relief

Petitioner filed a motion for relief from judgment in the Kalamazoo County Circuit Court on January 6, 2004.  (Cir. Ct. Docket Sheet, docket #21.)  In his motion, Petitioner raised five additional claims, none of which is presented in the instant habeas petition.  The circuit court denied the motion in an opinion and order issued October 14, 2004.  (10/14/04 Cir. Ct. Op. & Ord., docket #31.)  Petitioner filed an application for leave to appeal his motion for relief from judgment to both the Michigan Court of Appeals and the Michigan Supreme Court.  Those courts denied the motion for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D) on June 13, 2006 and October 31, 2006, respectively.  (6/13/06 MCA Ord., docket #31; 10/31/06 Mich. Ord., docket #32.)  Petitioner timely mailed the instant petition on or about January 3, 2007 and it was received by this Court on January 8, 2007.

### <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal

principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I. <u>Shackles</u>

In his first ground for habeas relief, Petitioner complains that the trial court violated his rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments by having him appear in shackles in front of the jury.  The relevant portion of the record demonstrates that Petitioner was shackled at the beginning of the third day of trial.  After an apparent off-the-record discussion with the deputies and counsel, the court determined that shackles were proper:

> THE COURT:  Let the record reflect that we do not have [the] jury in the courtroom.  This morning I was contacted by the deputies and it is my understanding that Mr. King has been making some threats to deputies and the jail and there is a witness that from the Department of Corrections who is down in the holding cell in the courtroom here and so I told the deputies that I authorized to have Mr. King in court in leg irons and also belly chains with one hand cuffed.  Mr. King, are you right handed?

> MR. HUFFMAN-KING:  Yes, sir.

> THE COURT: So, his right hand is not handcuffed so he can write something and work with his attorney on the case.

> Now, there is going to come a point in time, Mr. King, where – I think his name is Mr. Williams, is that right?

> MR. FENTON [PROSECUTOR]:  Yes.

> THE COURT:  Witness is going to be in the courtroom and we will talk to Mr. Williams also, but I won't tolerate any outburst in the courtroom.  You are certainly going to be here and participate in the trial, but if there is any outburst or if you act out, you run the risk of not being present for your trial in the courtroom, okay?

MR. HUFFMAN-KING:  Yes, sir.

THE COURT:  All right.

Then we will have the jury brought down and continue the trial. . . . Anything else, counsel?

MR. FENTON:  No, your Honor.

MR. GETTING [DEFENSE COUNSEL]:  Your Honor, I think that the record should reflect that I object to my client appearing before the jury in the chains and irons that he is in right now.  I believe that it is prejudicial.  The Court has already stated its reasons for doing so, but my objection should be noted for the record.

THE COURT:  Okay, your objection is noted.

I will indicate for the record that when I came in this morning, at first I told the jury to be here about 9:15 and then I had to speak with the deputies to find out what they wanted to talk about.

Mr. King is seated at a table and I had him brought in before the jury was brought in so, he is not literally shuffling his way into the courtroom with the leg irons on.  There is no covering on the table his –

MR. HUFFMAN-KING:  I don't have no leg irons on.

THE COURT:  You don't have leg irons. . . . You have no leg irons.

MR. HUFFMAN-KING:  No, sir.

THE COURT:  So you just have belly chains with one handcuff on your left hand.

MR. HUFFMAN-KING:  Right.

THE COURT:  All right.  Well, I think that will illustrate the fact that I'm not sure that anyone will be able to see the leg irons, I couldn't see from here on the bench whether or not he had them.  I thought that he was going to have them, but that is fine.

(Tr. III, 405-07.)

In deciding a legal question in a habeas corpus proceeding, the Court may apply only actual holdings of the Supreme Court in existence at the time the petitioner's conviction became final. *See Onifer*, 255 F.3d at 318. The Michigan Supreme Court denied Petitioner's application for leave to appeal on January 31, 2003. Petitioner's conviction became final on May 1, 2003, upon expiration of the 90-day period during which Petitioner could have sought certiorari in the United States Supreme Court. Consequently, this Court must review the legal landscape as it appeared in May of 2003.

In May 2003, only three Supreme Court cases had touched on the question whether the shackling of a defendant at trial offends the Due Process Clause. *See Ruimveld v. Birkett*, 404 F.3d 1006, 1011 (6th Cir. 2005) (discussing cases). First, in *Illinois v. Allen*, 397 U.S. 337 (1970), the Supreme Court considered whether an intentionally disruptive prisoner could forfeit his right to be present during his trial. In considering the other options available to a court facing a contumacious defendant, the Court noted the following:

> Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at trial. But even to contemplate such a technique, much less see it, arouses a feeling that no defendant should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.

*Id.* at 344. Nevertheless, the Court recognized that, in some limited circumstances, binding and gagging a defendant might be proper to protect the safety or security of all parties at trial.

Second, in *Estelle v. Williams*, 425 U.S. 501 (1976), the Supreme Court considered whether a defendant had the due process right not to be forced to appear before the jury in prison

garb. The Court found that requiring a defendant to appear in prison garb "is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 504. The *Estelle* Court did not expressly address the constitutionality of shackles, though a later Supreme Court decision referred to the case as recognizing "that [defendants] may not normally be forced to appear in court in shackles or prison garb." *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984).

Third, in *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Court considered "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.*

These three Supreme Court decisions contain no actual holding with respect to the constitutionality of shackling a defendant at trial. *See Ruimveld*, 404 F.3d at 1012. In *Deck v. Missouri*, 544 U.S. 622, 629 (2005), the Court addressed whether the routine use of shackles during the sentencing phase of a death penalty case violated the Due Process Clause. Before reaching that question, the Supreme Court for the first time expressly held that routine shackling of a defendant during the guilt phase of a trial violated the Due Process Clause. In doing so, however, the Court stated that the rule was long established. *Id.* at 626 ("The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need.") The Court reasoned that its prior statements:

> gave voice to a principle deeply embedded in the law. We now conclude that those statements identify a basic element of the "due process of law" protected by the Federal Constitution. Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a

particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.* (emphasis added). In other words, although the *Deck* case had not yet been decided by the Supreme Court at the time Petitioner's case was final, the opinion indicated that the law was well established before *Deck* was decided.

In *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005), the Sixth Circuit concluded that, based on the language of *Deck*, "the principle that shackling a defendant at trial without an individualized determination as to its necessity violates the due process clause was clearly established long before *Deck* was decided." *Id.* The *Lakin* court specifically held that the constitutional rule was clearly established with respect to the habeas review of a decision that was final in 1994, nine years before Petitioner's case became final in 2003. Applying *Lakin*, I conclude that it was clearly established that the Due Process Clause forbade the visible use of shackles at Petitioner's trial unless the trial court made an individualized determination on the facts specific to Petitioner's case that the use was justified by an essential state interest. *See Lakin*, 431 F.3d at 962 (quoting *Deck*, 544 U.S. at 624).

The record reflects that the trial court issued its order to shackle Petitioner only after considering information received from the deputies regarding threats made to the deputies and the jail. From the record, it is apparent that the deputies' information provided evidence about a particularlized risk created by Petitioner. The transcript also suggests that defense counsel was involved in the discussions leading up to the court's order to shackle Petitioner. In addition, the court expressed particular concern about Petitioner's threats because the next witness scheduled to testify at trial was Williams, who was Petitioner's accomplice in the shooting and was providing

testimony against Petitioner. The court apparently determined that Petitioner had made the threats as alleged and was particularly likely to be dangerous during the upcoming testimony, and it warned Petitioner to behave himself in court.

Petitioner first complains that he was not warned before he was placed in shackles and that the trial court did not determine that shackling was a last resort. He alleges that due process required the court to make a finding that other methods had been tried and that no alternative to shackling existed. In support of his assertion, he relies on dictum from *Allen*, 397 U.S. at 344, in which the Court stated that, to contemplate binding and gagging a defendant, "arouses a feeling that no person should be tried while shackled and gagged except as a last resort." *Id.*

The language quoted by Petitioner does not require a court to state on the record that no alternative to shackling exists. The *Allen* Court was discussing the binding and gagging of a defendant, not the shackling of the non-dominant hand to a belly chain. Second, as previously discussed, the *Allen* language is dictum. *See Ruimveld*, 404 F.3d at 1013. A federal court on habeas review may consider only the holdings, not the dicta, of the Supreme Court. *See Williams*, 529 U.S. at 412.

Petitioner next suggests that he was entitled to an evidentiary hearing before the trial court reached its decision to have him shackled. He relies on *Elledge v. Dugger*, 823 F.2d 1439, 1451-52, *withdrawn in other part*, 833 F.2d 250 (11th Cir. 1987) (citing *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223-24 (11th Cir. 1983)). Both *Elledge* and *Dugger* indicate that due process may require that a defendant be granted some opportunity to respond to the evidence or an opportunity to consult with his attorney before shackling. Although *Elledge* suggests that an evidentiary hearing is required in some circumstances, 823 F.2d at 1452, *Zygadlo* rejects the requirement of an

evidentiary hearing in all cases, 720 F.2d at 1224. Other circuits have held that an evidentiary hearing is not required. *See Duckett v. Godinez*, 67 F.3d 734, 749 n.7 (9th Cir. 1995), *cited in Walters v. Roe*, No. 96-55294, 1997 WL 577406, at *1 (9th Cir. Sept. 8, 1997). The Supreme Court, however, has never held that an evidentiary hearing is required. As a consequence, the fact that Petitioner did not receive an evidentiary hearing was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

Moreover, Petitioner fails to rebut by clear and convincing evidence the presumption that the state court's factual finding was correct. *See* 28 U.S.C. § 2254(e)(1). Petitioner did not attempt to dispute the factual evidence at the time the trial court made a record of its decision. Instead, defense counsel merely objected that he believed the ultimate decision to shackle Petitioner prejudiced Petitioner's right to a fair trial. (Tr. III, 406.) At sentencing, Petitioner objected for the first time to the court's failure to investigate the deputies' statements about Petitioner's threats before placing Petitioner in shackles. Even then, he did not state that he never threatened a deputy. Instead, he claimed that "there is no record of me threatening no staff at the County Jail and that is the reason why the County Sheriff Deputy said that I was being kept in restraints." (S. Tr., 6.) A statement that no record exists of a threat is not the same as a denial that the threat was made, whether to the jail staff or the deputies themselves. Petitioner has never sought an evidentiary hearing or even attempted to introduce an affidavit or other evidence disputing the deputies' representations. Petitioner therefore fails to demonstrate that the state court's decision was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

Finally, even had Petitioner shown that his shackling violated the Due Process Clause, his claim would be without merit because any error was harmless. In *Deck*, 544 U.S. at 1015, a case

proceeding before the Court on direct review, the Court held that a defendant need not demonstrate actual prejudice to make out a due process violation. Instead, the State must demonstrate that the error was harmless, that is, "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Although the Sixth Circuit subsequently applied the *Chapman* harmless-error standard to a habeas corpus case, *see Lakin*, 431 F.3d at 966, the Supreme Court has since made clear that, on habeas review, harmless error is assessed under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), not under the *Chapman* standard. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) ("We hold that in §2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*, 507 U. S. 619, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*, 386 U. S. 18"); *see also Vasquez v. Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007) (applying the *Brecht* standard to constitutional error in habeas case); *Ruimveld*, 404 F.3d at 1017-1018 (applying the *Brecht* harmless-error standard in a habeas shackling case). Under *Brecht*, the Court must consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. If "the matter is so evenly balanced" that a court has "grave doubt" as to the harmlessness of the error, it "should treat the error, not as if it were harmless, but as if it affected the verdict." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Upon review, I conclude that any constitutional error in shackling Petitioner did not have a substantial and injurious effect on the jury's verdict. The concerns underlying the prohibition on shackling were outlined by the Supreme Court in *Deck*, 544 U.S. at 630-31. Those concerns

included that effect of shackles on the jury's presumption of the defendant's innocence. *Id.* at 630. In addition, shackles can interfere with the prisoner's ability to communicate with his lawyer. *Id.* at 631. Further, the presence of shackles undermines the formal dignity of the court and its apparent objectivity at trial. *Id.*

In the instant case, the factors strongly suggest that the Supreme Court's concerns were not significantly impacted. First, it is not clear from the record that the jury actually saw the shackles placed on Petitioner. Petitioner's legs were not shackled; therefore the shackles would not have been visible when Petitioner was sitting down, notwithstanding the fact that the defense table had no skirt. In addition, the trial court took care to ensure that, after he was shackled, Petitioner was seated at the defense table before the jury entered the courtroom. Although Petitioner indicates that the shackles would have been visible whenever he stood for the jury's entrance, even that is not entirely clear. Only one of Petitioner's hands was shackled to a belly chain. If Petitioner only partly rose for the jury or had the belly chain under a suit jacket, it may not have been visible at all. Obviously, the trial judge was concerned about the possible prejudicial effect and sought to minimize it by making the shackles difficult to see. In sum, it is not apparent that shackles were present in a way that would undercut the presumption of innocence.

Second, Petitioner was not hampered in his communication with counsel. Petitioner's writing hand was at all times free, and his ability to speak with or direct notes to counsel was not impaired.

Third, the evidence against Petitioner was overwhelming. Williams, Petitioner's accessory in the offense, squarely implicated Petitioner as the shooter. (Tr. III, 509.) Admittedly, Petitioner challenged the credibility of Mark Williams, who was involved in the incident and had

a substantial incentive to lie because of a greatly advantageous plea agreement. Petitioner also challenged the credibility of other prosecution witnesses on the grounds that they were "snitches," who also had an incentive to lie. But Williams' testimony was consistent with Petitioner's admissions to his girlfriend, Teonna Williams, and with the admissions Petitioner made to Archie Parker, Adrian Travier and Louis McCoy. (Tr. III, 459-60, 463-64; Tr. III, 615.) Moreover, Archie Parker's testimony was particularly credible due to the strangeness of Petitioner's statement to Parker that the victim had turned around and said, "Thanks," after Petitioner shot him. (Tr. III, 615.) Lolita Rose corroborated Parker by testifying that Parker had asked her what such a response meant. (Tr. III, 630.) Parker's testimony also was consistent with the testimony of Rose Dolph, Patricia Strickland, and Charles Lewis, all of whom witnessed either the shooting or the events leading up to the shooting. Lewis positively identified Petitioner as the person who pointed a gun at Elmer. (Tr. III, 568, 571.) Both Dolph and Strickland testified that it was the taller, lighter-skinned assailant with the facial hair who fired the gun. (Tr. III, 589; Tr. III, 604-05.) The undisputed evidence was that Petitioner was substantially taller and thinner than Williams and that only he had facial hair. (Tr. III, 428-30, 517-18.) Much of the other witnesses' testimony was consistent with Williams' admission that, of the two, he was the person who had loudly taunted the victim. But those same witnesses corroborated Williams' claim that Petitioner fired the shots. Only Anthony Moore's testimony supported Petitioner's theory that Mark Williams was actually the shooter. And even Moore testified that Petitioner had told him that both Williams and Petitioner fired guns. (Tr. IV, 785.) Moreover, Moore's credibility was weakened by the fact that he had lied to the police several times in the case and had only told Detective Alofs about Williams' supposed statement one week before trial. (Tr. IV, 785, 786-87.) Even then, according to Alofs, when Moore contacted the police

shortly before trial, he never stated that Petitioner only fired his gun into the air, just that Petitioner had also fired a gun. (Tr. IV, 794-95.) And Williams denied having made a statement to Moore. (Tr. IV, 798.)

In sum, the whole of the evidence – including the consistent testimony of four witnesses to whom Petitioner made admissions and three witnesses who had seen all or part of the shooting – is overwhelming. Accordingly, even had constitutional error occurred, it would have been harmless. The state courts' rejection of Petitioner's first claim of error therefore constituted a reasonable application of established Supreme Court precedent.

II.    Sufficiency of the Evidence

In his second ground for habeas relief, Petitioner contends that the prosecution introduced insufficient evidence to support first-degree murder on either the felony-murder or premeditated-murder theory. He alleges that there was insufficient evidence to show beyond a reasonable doubt that the murder was premeditated. He also alleges that there was insufficient evidence that the murder was committed during the commission of a felony or attempted commission of a robbery.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*,

506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Petitioner contends that insufficient evidence exists to support the jury's finding of premeditation. He argues that the record as a whole does not indicate that the killing of the victim was a planned act. Instead, he contends, the evidence suggests that the gun was not pulled out until just before the shots were fired, and the fact that both Petitioner and the victim walked away from the crime scene indicates that the act was not planned.

First-degree premeditated murder is a specific intent crime that is defined under Michigan law as requiring proof that a defendant intended to kill and that the intent was deliberate and premeditated. MICH. COMP. LAWS § 750.316; *see also People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995). Premeditation and deliberation may be inferred from the circumstances surrounding the killing, including (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide. *People v. Anderson*, 531 N.W.2d 780, 786 (Mich Ct. App. 1995). Generally, there must be evidence of "a thought process undisturbed by hot blood" to prove first-degree murder. *People v. Plummer*, 581 N.W.2d 753, 757 (Mich. Ct. App. 1998) (quoting *People v. Morrin*, 187 N.W.2d 434, 450-51 (Mich. Ct. App. 1971)). Under Michigan law, "'[s]ome time span between [the] initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation.'" *People v. Tilley*, 273 N.W.2d 471, 474 (Mich. 1979) (quoting *People v. Hoffmeister*, 229 N.W.2d 305, 308 (Mich. 1975)).

> While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look."

*People v. Vail*, 227 N.W.2d 535, 538 (Mich. 1975) (quoting *Morrin*, 187 N.W.2d at 451).

Here, the evidence at trial, taken in the light most favorable to the prosecution, provided sufficient proof that Petitioner had premeditated the shooting. Williams testified that he and Petitioner intended to rob Elmer. Petitioner and Williams followed Elmer for many blocks and repeatedly demanded cigarettes and money. Further, according to Lewis' testimony, Petitioner drew his weapon and pointed it at Elmer for some time before any shots were fired. He therefore had sufficient time to take a second look at his offense. Moreover, no evidence suggested that the victim took any aggressive action or that Petitioner acted with "hot blood." To the contrary, Elmer merely continued walking until Petitioner fired his shots. The jury had ample evidence from which to conclude that Petitioner had premeditated the shooting. As a consequence, the state-court's denial of his claim was neither contrary to nor an unreasonable application of established Supreme Court precedent.

Petitioner also argues that insufficient evidence existed to support the jury's finding of felony murder. Specifically, he contends that insufficient evidence supported the offense of attempted armed or unarmed robbery as the predicate felony. Petitioner, however, is not being held on a conviction for felony murder. The court at sentencing vacated the felony-murder conviction and sentenced Petitioner only on first-degree premeditated murder. As a consequence, Petitioner's challenge to the evidence supporting a conviction for first-degree felony murder is moot.

III.     Prosecutorial Misconduct

Petitioner argues that the prosecutor violated his right to a fair trial by vouching for or bolstering the testimony of Mark Williams on three occasions. He also argues that the prosecutor engaged in misconduct by arguing that Petitioner was a gang member.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the Court employs a two-part test. First, the Court must consider whether the prosecutor's comments or remarks were improper. *See Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008). If the prosecutor's conduct was improper, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47.

The threshold question in habeas corpus analysis is whether the due-process right relied upon by petitioner has been clearly established by decisions of the United States Supreme Court. 28 U.S.C. § 2254(d). In the context of this case, the issue is whether the proposition that the

prosecutor violates the Due Process Clause by vouching for witness credibility has been clearly established by holdings of the Supreme Court. I find that it has not. Although the Court has recognized that certain prosecutorial misconduct, if severe and pervasive, can violate the Due Process Clause, *see, e.g., Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (presentation of knowingly false testimony), the Court has never condemned under due-process principles prosecutorial "vouching." The Court's only occasion to opine in this area arose in a federal prosecution in which the prosecutor shared with the jury his "personal impression" that the defendant intended to commit fraud. *United States v. Young*, 470 U.S. 1 (1985). Examining the totality of the proceedings, the Court refused to find that the prosecutor's remark constituted plain error. In reaching this conclusion, the Court said that a prosecutor violates rules of professional conduct by expressing his personal belief as to the truth or falsity of any testimony or evidence of the guilt of the defendant. 470 U.S. at 7. The Court nevertheless refused to find plain error. Two observations must be made concerning the sufficiency of the *Young* decision to satisfy AEDPA's requirement that a constitutional right be clearly established by holdings of the Supreme Court. First, the *Young* Court was not engaged in constitutional adjudication, but was merely reviewing a federal trial for the presence of plain error. The Court did not cite the Due Process Clause or any of its cases decided thereunder. Although the Court said that vouching can be unprofessional, it has never said that vouching is unconstitutional. Second, the Court's comments concerning this particular species of prosecutorial misconduct were clearly *dictum*, as the Court went on to hold that the prosecutor's error, whatever it may have been, did not affect the fundamental fairness of the trial. 470 U.S. at 20. Consequently, petitioner cannot point to any Supreme Court holding that condemns under federal constitutional principles comments

by the prosecutor that may be construed as expressing a personal opinion concerning witness credibility.

The lower federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). The first type impermissibly places the government's prestige behind the witness to enhance the witness's credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955). Even applying these lower court holdings, I find no impermissible vouching occurred in this case.

Petitioner argues that the prosecutor engaged in impermissible vouching for Mark Williams on three occasions. First, Petitioner objects to the following rebuttal argument by the prosecutor, which was also the subject of an objection and ruling by the trial court:

> MR. FENTON: . . . [t]here is no evidence in this case that Mark Williams was the shooter except from the Defendant's mouth. There is all kinds of evidence that the Defendant was the shooter. No evidence at all that Mark Williams was the shooter, except from the Defendant's mouth.
>
> When you compare the evidence against Mark Williams to the evidence against Deron Huffman-King –
>
> MR. GETTING: Your Honor, at this point in time I am going to object. Mark Williams is not on trial. There was no evidence presented against him and there is no evidence for him to compare against.

THE COURT:  Mr. Fenton?

MR. FENTON:  No response, your Honor.

THE COURT:  All right.  Sustained.

The evidence being presented in this case is against this Defendant.

(Tr. IV, 840-41.)

Second, Petitioner suggests that the prosecutor improperly vouched for Mark Williams during his opening statement.  In discussing what Williams would say at trial, the prosecutor acknowledged that Williams would admit to having lied to the police and only telling the truth after he had been charged and had a lawyer appointed:

MR. FENTON:  . . . Once he was charged, however, and after a lawyer was appointed to represent him and authorities were satisfied that he was not the trigger man, an agreement was made with him.

MR. GETTING:  Your Honor, I am going to object a[t] this point.  The statement that the authorities were satisfied is vouching for the credibility of this witness.  That is a decision that the jury has to make and it is improper argument at this point in time.

THE COURT:  Mr. Fenton, any response?

MR. FENTON:  It was part of a plea agreement, Judge, it was written right into the plea agreement.

THE COURT:  All right, the objection is overruled.  This is an opening statement as to what you expect to prove and if you expect to – (inaudible) along that line, then the objection is overruled.

(Tr. II, 239-240.)

Third, Petitioner suggests that the following portion of the opening statement also bolstered Williams by suggesting that he could not have lied after the plea agreement was entered:

MR. FENTON: . . . The agreement was that Mr. Williams would be completely cooperative with authorities, that he would tell authorities everything that he knew about the crime and he would testify truthfully at all court proceedings. In exchange, he would be allowed to plead guilty to a less serious crime, known as accessory after the fact to a murder. A charge which appropriately reflects his involvement in this case. There should be no evidence that once he entered into this agreement that he ever lied again.

(Tr. II, 240-41.)

Petitioner's claims of improper vouching do not meet the high standard to establish a due process violation. Petitioner's first argument is that the prosecutor vouched for Williams by urging the jury to compare the evidence incriminating Williams as the shooter with the evidence against Petitioner. It is unnecessary to decide whether this argument, had it been allowed, would have been improper. Defense counsel objected to the argument and the court sustained the objection, instructing the jury that the only evidence being presented in the case was against Petitioner, not Williams. The prosecution never got to the point of comparing the evidence against the two men. Any potential harm was cured by the court's ruling and instruction. The touchstone is unfair prejudice, and none occurred here, because the prosecution was not allowed to make the argument that Petitioner now challenges.

Petitioner's second claim of vouching also fails to demonstrate a denial of due process. Although the prosecutor arguably suggested that Williams should be believed because the authorities already determined that he was only an accessory after the fact, that suggestion was not the principal subject of the prosecutor's statement. Instead, the prosecutor was outlining Williams' expected testimony, which included an acknowledgment that Williams had previously lied to police and that he had been charged with the murder himself before he decided to testify against Petitioner. Even if improper, the statement falls far short of creating the kind of unfairness that would implicate

due process.  *See Darden*, 477 U.S. at 181.  Moreover, instructing a jury that the arguments are not evidence has sometimes been deemed to cure any improprieties in a closing argument.  *Byrd v. Collins*, 209 F.3d 486, 538 (6th Cir. 2000).   Similarly, instructing the jury regarding the methods it should use to evaluate credibility helps to cure any improprieties.  *Id.*  In this action, the court gave both instructions.  (*See* Tr. V, 857, 859.)

Plaintiff's third claim of vouching also fails to state a due process claim.  Plaintiff complains that the prosecutor stated that Williams did not lie after he entered his plea.  The prosecutor's opening statement, however, was more limited.  Instead, the prosecutor, in outlining Williams' expected testimony, said only that "[t]here *should be* no evidence that once he entered into this agreement that he ever lied again."  (Tr. II, 241 (emphasis added).)  That statement amounts to nothing more than the prosecutor's anticipation of what the evidence was expected to show.  Indeed, at trial, Petitioner's attorney used the prosecutor's emphasis on Williams' promise to be truthful by showing ways in which Williams had continued to lie at Petitioner's preliminary hearing.  Further, even assuming some potential for harm in the opening statement, the court adequately cured any impropriety by instructing the jury regarding what constitutes evidence and how to evaluate credibility.  *See Byrd*, 209 F.3d at 538.

Petitioner next argues that the prosecutor committed misconduct during his closing argument by stating that Petitioner was a gang member.  According to Petitioner, the prosecutor's argument suggested to the jury that Petitioner was a "bad person" and therefore was more likely to have committed the murder.  At issue was the following specific statement:

> MR. FENTON:  Archie Parker, the fifth reason.  Archie Parker is a very important witness.  You might not have liked him at first, you don't have to.  He doesn't speak very properly, it [sic] is not very educated as old as he is, he is illiterate

-45-

and that is a sad fact. But you know what, Mr. Parker told you the truth. Where else would he have gotten that kind of information, very specific information that the Defendant came over to his house where he was living at 135 Reed Street and said, – why would he make something like this up. Pit i[t] on the G, I'm going to tell you something, don't tell anyone, pit it on the G. What is G? Gangster Disciples. Either they are gang members or they think they are gang members or something like that. But apparently this is some sort of sworn alliance between them that they are not going to tell. . . .

(Tr. IV, 753-54.)

Although in extreme circumstances prosecutorial misconduct has been found when a prosecutor dwells on a defendant's bad character to prove that he or she committed a crime, no such circumstance occurred in the instant case. *See Cristini*, 526 F.3d at 899-900 (distinguishing *Washington v. Hofbauer*, 228 F.3d 689, 699-700 (6th Cir. 2000), in which the prosecutor built his closing argument on the defendant's lack of work, domestic assault, drunkenness, and failure to make payments on his girlfriend's home to convict the defendant of criminal sexual conduct against his girlfriend's daughter). The prosecutor's reference to gang membership is was a simple reference to the testimony of Archie Parker. Parker testified that Petitioner prefaced his admission to the shooting by saying, "Pit it on the G." Parker explained that "G" referred to a gang member the Gangster Disciples and the expression meant that you would not tell anyone. (Tr. III, 617.) In referring to Parker's testimony, the prosecutor expressly noted that he did not know whether Petitioner and Parker were gang members. The prosecutor merely reminded the jury that the statement meant that Petitioner had spoken to Parker with an understanding that Parker would not tell anyone. (Tr. IV, 754.) Parker's evidence clearly was relevant to the context in which Petitioner's admission occurred, and the prosecutor's closing remarks constituted proper comment on the evidence. *See United States v. Kuehne*, 547 F.3d 667, 688-89 (6th Cir. 2008) (noting that a

co-conspirator's testimony about the defendant's prior prison time was relevant to proving how the participants were connected to one another); *Givens v. Yukins*, No. 98-2429, 2000 WL 1828484, at *7 (6th Cir. Dec. 5, 2000) (referring to the petitioner as a liar, thief, drug kingpin, and prostitute in closing argument did not constitute prosecutorial misconduct when the prosecutor's comments were supported by evidence admitted at trial). In sum, the prosecutor's remarks were not improper.

Moreover, even if the remarks were unfairly prejudicial in some way, they fall far short of the sort of unfairness protected by the Due Process Clause. The argument was neither extensive nor misleading. *See Young*, 470 U.S. at 11-12. The evidence against Petitioner was strong. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935). Further, as previously discussed, the jury was squarely instructed that the prosecutor's remarks were not evidence. *See Byrd*, 209 F.3d at 538.

For all these reasons, the state courts properly concluded that Petitioner's claims of prosecutorial misconduct did not rise to the level of a due process violation.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated: November 5, 2009          /s/ Joseph G. Scoville
                                 United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).